ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| CÉSAR O. ROSARIO COLÓN, ET AL.<br><br>Apelantes<br><br>v.<br><br>HOSPITAL MANATÍ MEDICAL CENTER; DR. MIGUEL ORTIZ BOU, ET AL.<br><br>Apelados | KLAN202400803 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo<br><br>Caso Núm.: MT2018CV00150<br><br>Sobre: Daños y Perjuicios, Impericia Médica |
|---|---|---|

Panel integrado por su presidenta, la Jueza Romero García, el Juez Rivera Torres y el Juez Sánchez Báez[1]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de junio de 2026.

Comparecieron ante nos la Sra. Wanda De León Carrasquillo (en adelante, "señora De León") y el Sr. Francisco Rosado De León (en adelante, "señor Rosado") (en conjunto, los "Apelantes"), [2] mediante un recurso de *Apelación* presentado el 30 de agosto de 2024. Nos solicitaron la revocación de la *Sentencia* emitida el 23 de abril de 2024 y notificada el 2 de mayo de 2024, por el Tribunal de Primera Instancia, Sala Superior de Arecibo (en adelante, "foro primario" o "foro *a quo*"). Mediante esta se desestimó la causa de acción.

Por los fundamentos que expondremos a continuación, **confirmamos** la sentencia recurrida.

---

[1] Mediante la Orden Administrativa OATA-2025-002 emitida el 9 de enero de 2025 se designó al Juez Isaías Sánchez Báez en sustitución de la Jueza Gloria L. Lebrón Nieves.

[2] Del recurso de Apelación surge que comparece, además, el Sr. Cesar O. Rosario Colón. Sin embargo, este falleció durante el transcurso del procedimiento ante el Tribunal de Primera Instancia, por lo que no podía continuar como parte en dicho foro ni comparecer antes este tribunal. Lo procedente era sustituirlo por su sucesión y eliminar su nombre del epígrafe. Aunque su sucesión fue incluida como demandada, no se eliminó su nombre. Así pues, aunque sea incorrecto que aparezca su nombre en el epígrafe, para fines administrativo, se mantiene tal cual fue conservado por el foro primario.

**-I-**

El 14 de septiembre de 2018, los Apelantes presentaron una *Demanda* contra el Hospital Manatí Medical Center (en adelante, "HMMC");[3] el Dr. Miguel Ortiz Bou (en adelante, "doctor Ortiz"), su esposa Fulana de Tal y la sociedad legal de gananciales compuesta entre ambos; la Dra. Marielys Otero Maldonado (en adelante, "doctora Otero"), su esposo Perencejo de Tal y la sociedad legal de gananciales compuesta entre ambos; The Millennium Institute for Advance Nursing Care, Inc.;[4] las Compañías Aseguradoras A, B, C, y Mengano de Tal (en conjunto, "Apelados").

En esencia, alegaron que el 16 de septiembre de 2017, el Sr. César O. Rosario Colón (en adelante, "señor Rosario") fue admitido al HMMC con un cuadro clínico de pulmonía, bajo el cuidado del doctor Ortiz. Adujeron que, durante la hospitalización, se descartó que el padecimiento fuera de origen cardiovascular y que resultaba poco probable que estuviera relacionado con la pulmonía. Según expusieron, el dolor que aquejaba al paciente se localizaba en la espalda, particularmente en las vértebras de la columna torácica.

Aseveraron que los estudios de medicina nuclear indicaban la presencia de fracturas de compresión y que era poco probable que existiera un proceso infeccioso. Sin embargo, sostuvieron que los estudios radiológicos no detectaron fracturas. Asimismo, argumentaron que una fisiatra describió la lesión como un área de eritema en la piel acompañada de dolor vertebral a la palpación, hallazgos que, a juicio de los Apelantes, eran compatibles con un proceso infeccioso en la columna vertebral sugestivo de osteomielitis. De esta forma, sostuvieron que dichos hallazgos fueron ignorados y que no se realizó una correlación clínica

---

[3] Apéndice de los Apelantes, anejo I, págs. 3-8.
[4] El 15 de febrero de 2019 se emitió *Sentencia Parcial* declarando ha lugar la solicitud de desistimiento voluntario contra The Millennium Institute for Advance Nursing Care, Inc. Véase, SUMAC-TPI, entrada núm. 36.

adecuada con los resultados del estudio radiológico, en el cual se había planteado la sospecha de disquitis.

Aseveraron, además, que los médicos consideraron concluyentes los resultados de los estudios nucleares, aun cuando estos no concordaban con el cuadro clínico del paciente ni con los hallazgos del examen físico.

Asimismo, los Apelantes señalaron que el tratamiento y plan de manejo clínico se enfocaron en la pulmonía, a pesar de que se había disipado al comienzo de la hospitalización, mientras la infección vertebral continuaba progresando. Sostuvieron que el 10 de octubre de 2017, el doctor Ortiz otorgó el alta al paciente, aun cuando este presentaba dolor a la palpación de la pared torácica, la espalda y las vértebras. Esto es, a pesar de padecer de osteomielitis vertebral, condición que posteriormente provocó severas deficiencias neurológicas y paraplejia, lo que requirió que recibiera asistencia médico-hospitalaria en dos hospitales distintos y culminó con una intervención neuroquirúrgica.

Ante ese cuadro fáctico, los Apelantes alegaron que los médicos que atendieron al señor Rosario en el HMMC incurrieron en desviaciones sustanciales de los estándares de la práctica médica al no identificar, correlacionar ni tratar adecuadamente signos compatibles con un proceso infeccioso vertebral, específicamente osteomielitis o disquitis. Según sostuvieron, ello provocó el deterioro físico y emocional del señor Rosario y afectó significativamente la vida de los Apelantes, quienes reclamaron daños por angustias mentales y por la alteración de su vida familiar.

Luego de los trámites correspondientes relacionados con los emplazamientos, el 11 de diciembre de 2018, el HMMC presentó su

*Contestación a demanda,* en la que negó la mayoría de las alegaciones.[5]

Por su parte, el 9 de enero de 2019, la doctora Otero presentó su *Contestación a demanda.*[6] En esta negó categóricamente haberse apartado de los estándares aplicables de la práctica médica y rechazó las alegaciones que le imputaban un diagnóstico o manejo inadecuado del cuadro clínico del señor Rosario. Asimismo, negó que del expediente médico surgieran muchas de las conclusiones formuladas por la parte demandante respecto a la evaluación, tratamiento y evolución del paciente durante su hospitalización.

Por último, el 8 de febrero de 2019, el doctor Ortiz presentó su *Contestación a demanda.*[7] Admitió que el paciente fue ingresado el 16 de septiembre de 2017 con un cuadro clínico de pulmonía, pero negó haber recibido quejas de dolor torácico hasta fechas posteriores, impugnando la secuencia de eventos y el contenido clínico alegado por los demandantes. También admitió haber ordenado estudios de medicina nuclear, pero negó que estos, o cualquier otro hallazgo, evidenciaran una infección vertebral o algún proceso que requiriera un manejo distinto. Igualmente, negó que el paciente hubiera sido dado de alta con osteomielitis vertebral y rechazó categóricamente que la evolución clínica posterior fuera atribuible a su intervención médica.

Luego de los trámites pertinentes del descubrimiento de prueba, el 11 de enero de 2021 se informó el fallecimiento del señor Rosario.[8] En consecuencia, el 24 de mayo de 2021 se presentó una demanda enmendada mediante la cual se incluyó como codemandados a los herederos de este.[9]

---

[5] Apéndice de los Apelantes, anejo 4, págs. 53-59.
[6] *Id.*, anejo 5, págs. 60-63.
[7] *Id.*, anejo 6, págs. 64-68.
[8] SUMAC-TPI, entrada núm. 129.
[9] Apéndice de los Apelantes, anejo 10, págs. 86-91.

La Conferencia con Antelación a Juicio se celebró el 23 de diciembre de 2021.[10] Tras varios asuntos procesales, el 4 de enero de 2024, el foro primario emitió una *Sentencia Parcial* mediante la cual declaró ha lugar la solicitud de desistimiento con perjuicio presentada por los Apelantes respecto al HMMC, luego de que las partes alcanzaran un acuerdo transaccional privado.[11]

El juicio en su fondo se celebró los días 8, 9 y 11 de enero de 2024.[12] Por los Apelantes testificaron el doctor Edwin Miranda Aponte (en adelante, "doctor Miranda"), en calidad de perito; la señora De León, y el señor Rosado.

Sometida la prueba por los Apelantes, los Apelados presentaron una solicitud de desestimación al amparo de la Regla 39.2(c) de Procedimiento Civil, *infra*. Luego de escuchar los argumentos de las partes, el foro primario declaró ha lugar la solicitud y desestimó la causa de acción. Dicha determinación fue reducida a escrito mediante la *Sentencia* emitida el 23 de abril de 2024 y notificada el 10 de mayo de 2024.[13]

En esta, el foro *a quo* concluyó que los Apelantes no lograron acreditar ninguno de los elementos esenciales de una reclamación por impericia médica. Destacó que los estudios diagnósticos realizados durante la hospitalización —incluyendo CT, MRI, Bone Scan y Gallium Scan— no evidenciaron infección activa y que el paciente fue dado de alta sin dolor, sin signos de infección y con tratamiento ambulatorio. También resaltó que el propio perito de los Apelantes admitió que los estudios ordenados eran los correctos y que inicialmente no había evaluado los expedientes médicos del Hospital Dr. Susoni, los cuales posteriormente revelaron que la

---

[10] *Id.*, anejo 16, págs. 146.
[11] *Id.*, anejo 18, págs. 287-288.
[12] *Id.*, anejos 19-21, págs. 289-302.
[13] *Id.*, anejo 22, págs. 303-323.

osteomielitis detectada en noviembre de 2017 era de carácter agudo y compatible con un desarrollo posterior al alta hospitalaria.

Además, el foro primario concluyó que el perito de los Apelantes no ofreció una opinión pericial confiable ni completa, pues no contó con la totalidad del expediente clínico, particularmente el correspondiente al Hospital Dr. Susoni, y admitió que su opinión habría variado de haber tenido acceso a evidencia posterior. Asimismo, determinó que los Apelantes no presentaron prueba suficiente para derrotar la presunción de corrección que ampara la actuación médica, ni para demostrar una desviación del estándar de cuidado aplicable o establecer un nexo causal entre las actuaciones de los Apelados y la condición que posteriormente desarrolló el paciente.

En consecuencia, dictó sentencia declarando con lugar la solicitud de desestimación y desestimó la demanda presentada contra el doctor Ortiz y la doctora Otero.

Inconformes, los Apelantes presentaron una *Reconsideración* el 17 de mayo de 2024.[14] Esta fue declarada sin lugar el 31 de julio de 2024.[15]

Aún inconforme, el 30 de agosto de 2024, los Apelantes recurrieron antes nos y formularon los señalamientos de error siguientes:

1. Violó el derecho de la parte Demandante a un juicio justo, al incumplir con su propio estándar de evaluación, imponiendo su propio criterio médico sin tener las calificaciones requeridas por las Reglas 702 y 703 de Evidencia, y aun por encima de la opinión informada y no refutada del perito de la parte Demandante por parte de ningún otro perito durante el juicio.

2. Erró el Honorable Tribunal TPI al concluir que la parte Demandada cumplió con el estándar de la Regla 39.2(c) por lo que justificaba desestimar la Demanda al amparo de la referida Regla.

3. El Honorable TPI violó los derechos de la parte Demandante al emitir una Sentencia con criterios distintos a los que durante el juicio supuestamente

---

[14] *Id.*, anejo 23, págs. 324-328.
[15] *Id.*, anejo 1, págs. 1-2.

utilice[sic] para desestimar la Demanda al amparo de la Regla 39.2(c).

Por alegarse que el foro primario erró en la apreciación de prueba oral, los Apelantes presentaron ante esta Curia la transcripción del juicio. La transcripción fue acogida como estipulada por las partes el 11 de abril de 2025. Luego de varios trámites procesales, los Apelados presentaron sus respectivos alegatos el 5 y 15 de mayo de 2025.

Con el beneficio de la comparecencia de las partes y de la transcripción de la prueba oral, procedemos a exponer las normas jurídicas aplicables al caso ante nuestra consideración.

**-II-**

**A. Apreciación de la prueba**

Es norma reiterada que los tribunales apelativos tenemos la facultad de revisar en su totalidad las conclusiones de derecho emitidas por el Tribunal de Primera Instancia. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Sin embargo, en cuanto a las determinaciones de hechos, la Regla 42.2 de Procedimiento Civil dispone lo siguiente:

> Las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos.

32 LPRA Ap. V, R. 42.2.

Lo anterior responde a que el foro primario merece gran deferencia, pues es quien se encuentra en mejor posición para evaluar y adjudicar la credibilidad de los testigos. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 810 (2009); *Argüello v. Argüello*, 155 DPR 62, 79 (2001). Es decir, es el Tribunal de Primera Instancia quien tiene la oportunidad de apreciar los gestos, titubeos, contradicciones, manierismos, dudas, vacilaciones y demás elementos subjetivos de los testigos que declaran en el pleito.

*Argüello v. Argüello*, supra, págs. 78, citando a *Figueroa v. Am. Railroad Co.*, 64 DPR 335, 336 (1944).

Por ello, nuestro Tribunal Supremo ha sido enfático al señalar que los tribunales apelativos —como norma general— debemos abstenernos de intervenir con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos realizadas por el foro primario, salvo que se demuestre que este incurrió en error manifiesto, pasión, prejuicio o parcialidad. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 917 (2016); *Dávila Nieves v. Meléndez Marín*, supra, pág. 771; *Ramírez Ferrer v. Conagra Foods PR*, supra, pág. 811; *Argüello v. Argüello*, supra págs. 78-79.

Así pues, nuestra intervención respecto a la prueba testifical solo procederá cuando, tras llevar un análisis integral de esta, "nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia". *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 918. Por consiguiente, nuestra facultad para sustituir las determinaciones efectuadas por el Tribunal de Primera Instancia se limita a aquellas circunstancias en las que no exista base suficiente en la prueba admitida para sostenerla. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022); *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 794 (2020).

De este modo, la parte que impugne las determinaciones de hechos emitidas por el foro primario debe identificar el error manifiesto o fundamentar adecuadamente la existencia de pasión, prejuicio o parcialidad. *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009). Además, deberá "sustentar sus alegaciones con evidencia suficiente, pues estas no deben convertirse en un instrumento para ejercer presión contra el Tribunal de Primera Instancia". *Dávila Nieves v. Meléndez Marín,* supra, pág. 775. Solo así el foro apelativo podrá evaluar si el juzgador de los hechos

cumplió con su rol de adjudicar la controversia conforme a derecho y de manera imparcial. *Id.*, pág. 777.

Particularmente, en cuanto a la prueba pericial, ningún tribunal está obligado a adoptar las conclusiones de un perito, aun cuando estas sean técnicamente correctas. *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 918. Por consiguiente, todo tribunal tiene discreción para adoptar su propio criterio al apreciar dicha prueba. *Id.*, citando a *Zambrana v. Hospital Santo Asilo de Damas*, 109 DPR 517, 522 (1980), y a *Prieto v. Maryland Casualty* Co., 98 DPR 594, 623 (1965). Asimismo, los tribunales apelativos se encontrarán en la igual posición que el foro de instancia para evaluar la prueba pericial. *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 918; *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

**B. Daños y perjuicios – impericia médica**

La reclamación por daños civiles extracontractuales tiene su origen en el Artículo 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA § 5141.[16] En lo pertinente, dicho estatuto dispone que "[e]l que por acción y omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]". *Id.*

De este modo, la parte que promueve una causa de acción al amparo de dicho artículo debe establecer: "(1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión cual tiene que ser culposo o negligente". *Pérez et al. v. Lares Medical et al.,* 207 DPR 965, 976 (2021); *López v. Porrata Doria*, 169 DPR 135, 150 (2006). Corresponde al demandante probar estos tres elementos mediante preponderancia de la prueba. *SLG. Colón- Rivas v. ELA*, 196 DPR 855, 864 (2016).

---

[16] Advertimos que el Artículo 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA § 5141, fue derogado por el Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801. No obstante, por ser el estatuto vigente al momento de los hechos en controversia, haremos referencia a lo dispuesto en el Código Civil del 1930.

En cuanto al primer elemento, la existencia de un daño real, nuestro Tribunal Supremo lo ha definido como "todo aquel menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, ya sea en su propiedad o en su patrimonio". *Soto Cabral v. ELA*, 138 DPR 298, 310 (1995). Para que exista un daño indemnizable deben concurrir tres elementos esenciales: (1) que el daño cause una lesión, pérdida o menoscabo; (2) que recaiga sobre bienes o intereses jurídicamente protegidos de una persona, y 3) que sea susceptible de resarcimiento. *Id.*, pág. 312.

El segundo elemento en una acción de daños es la existencia de un nexo causal entre el daño y la acción u omisión del demandado. Este análisis se enmarca en la doctrina de la causalidad adecuada. *Cruz Flores v. Hospital Ryder Memorial, Inc.*, 210 DPR 465, 484-485 (2022). Dicha doctrina procura establecer la relación entre el daño y su autor mediante la interrogante de cuál fue la causa próxima del resultado dañoso. *Santiago v. Sup. Grande*, 166 DPR 796, 818 (2006).

Así pues, "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Pérez Hernández v. Lares Medical Center, Inc.,* supra, págs. 976-977, citando a *López v. Porrata Doria,* supra, págs. 151-152. En consecuencia, "un daño podrá considerarse como el resultado probable y natural de un acto u omisión negligente, si luego del suceso —mirándolo retrospectivamente— éste parece ser la consecuencia razonable y común de la acción u omisión de que se trate". *Santiago v. Sup. Grande, supra.*

En síntesis, debe existir una relación entre el daño reclamado y la consecuencia razonable, común y natural de la acción u omisión atribuida al demandado. *Cruz Flores Hospital Ryder Memorial, Inc.,* supra, pág. 485.

Ahora bien, cuando concurren varias causas, lo determinante es identificar cuál de ellas constituyó la causa eficiente; esto es, aquella que, por sus circunstancias particulares, determinó la ocurrencia del daño. *Cárdenas Maxán v. Rodríguez Rodriguez*, 125 DPR 702, 710 (1990).

La relación causal debe ser probada por la parte demandante con certeza razonable y no mediante conjeturas o especulaciones. *López vs. Hosp. Presbiteriano, Inc.*, 117 DPR 197, 221 (1978). El propósito de la doctrina de causalidad adecuada es evitar que la responsabilidad civil se extienda a límites irrazonables. *Rivera vs. Garrido & Co., Inc*, 134 DPR 840, 852 (1993).

En cuanto al elemento de culpa o negligencia, este comprende la falta del debido cuidado y consiste en "no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias". *Pérez Hernández et al. v. Lares Medical et al.,* supra, pág. 977; *López v. Porrata Doria*, supra, pág. 151, citando a *Toro Aponte v. E.L.A.*, 142 DPR 464, 473 (1997).

De este modo, nuestro ordenamiento jurídico reconoce que el criterio central para adjudicar responsabilidad por culpa o negligencia es el deber de previsión. *Cruz Flores et al. v. Hosp. Ryder et al.*, supra, pág. 484. "Para determinar si el resultado era razonablemente previsible es preciso acudir a la figura [de la persona] prudente y razonable, que es aquella persona que actúa con el grado de cuidado, diligencia, vigilancia y precaución exigidos por las circunstancias". *Pons v. Engebretson*, 160 DPR 347, 355 (2003); *Monllor v. Soc. de Gananciales*, 138 DPR 600, 604 (1995).

No obstante, el deber de previsión no se extiende a todo riesgo imaginable. Lo determinante es evaluar si era razonablemente posible anticipar las consecuencias de la acción u omisión imputada. *Montalvo v. Cruz*, 144 DPR 748, 756 (1998).

Por otro lado, en materia con impericia médica, uno de los casos rectores es *López v. Dr. Cañizares*, 163 DPR 119 (2004), en el que nuestro Tribunal Supremo discutió extensamente la responsabilidad profesional de los médicos en el tratamiento de sus pacientes. Allí reconoció que la responsabilidad civil derivada de actos de impericia o negligencia médica emana del Artículo 1802 del Código Civil de 1930, supra. *Id.,* pág. 132. Véase, además, *Cruz Flores v. Hospital Ryder Memorial Inc.*, supra, págs. 486-487.

Asimismo, explicó que la responsabilidad del médico surge de su "'obligación de brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza', y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, 'satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica'". *López v. Dr. Cañizares*, supra, pág. 133, citando a *Pérez Torres v. Bladuell Ramos*, 120 DPR 295, 302 (1988).

Por ello, nuestro Tribunal Supremio ha requerido que el demandante establezca "**mediante prueba pericial cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de sus pacientes**". *López v. Dr. Cañizares,* supra (énfasis suplido). En otras palabras, debe demostrar cuál era la norma de cuidado aplicable al caso, que el médico demandado se apartó de ella y que dicha desviación fue la causa de los daños reclamados. *Id.*, págs. 133-134; *Arrieta v. De la Vega*, 165 DPR 538, 548-549 (2005).

Ahora bien, el Tribunal Supremo también ha reconocido que los médicos gozán de amplia discreción para formular juicios profesionales en cuanto al diagnóstico y tratamiento de sus pacientes. Por ello, un médico no incurrirá en responsabilidad civil cuando el tratamiento brindado, aunque posteriormente resulte erróneo, se encuentre dentro de parámetros razonables y sea

aceptado por sectores significativos de la profesión médica. Ello obedece a que "el error de juicio honesto e informado cometido por un médico en el tratamiento de su paciente no constituye fuente de responsabilidad". *López v. Dr. Cañizares*, supra, pág. 134.

Además, "[u]n médico no puede garantizar un resultado favorable en toda intervención". *Arrieta v. De la Vega*, supra, pág. 550. Por el contrario, la práctica médica admite errores razonables de juicio. *Id.*

No obstante, el criterio de razonabilidad exige que el médico realice los exámenes necesarios para arribar a un diagnóstico adecuado. Así, debe procurar conocer cabalmente los síntomas y la condición del paciente, agotando los medios diagnósticos que el conocimiento científico pone a disposición de la profesión médica para distinguir entre padecimientos que requieren tratamientos distintos y específicos. *Id.*

En ese contexto, la defensa de error de juicio procederá cuando exista una duda razonable sobre la condición o enfermedad del paciente; cuando las autoridades médicas reconocidas se encuentran divididas respecto al procedimiento diagnóstico apropiado; o cuando el diagnóstico haya sido producto de un esfuerzo concienzudo del médico para conocer los síntomas y la condición del paciente. *Id.*; *Santiago Otero v. Méndez*, 135 DPR 540, 549-550 (1994).

Por último, nuestro más alto foro ha reiterado que a los médicos les cobija una presunción de que han ejercido un grado razonable de cuidado y que el tratamiento brindado fue el adecuado. En consecuencia, corresponde al demandante derrotar dicha presunción mediante preponderancia de la prueba, "demostrando que el médico fue negligente y que dicha conducta negligente fue el factor que con mayor probabilidad causó los daños alegados". *López v. Dr. Cañizares*, supra, pág. 135.

A esos efectos, el demandante no puede descansar en la mera posibilidad de que el daño haya sido consecuencia de una actuación negligente. La negligencia no puede fundamentarse en especulación o conjetura. Asimismo, esta no se presume por el mero hecho de que el paciente haya sufrido un daño o de que el tratamiento no haya producido el resultado esperado. *Id.* La carga de probar todos los elementos de la causa de acción recae sobre el demandante.

**C. Desestimación por insuficiencia de la prueba (*nonsuit*)**

La Regla 39.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2, contempla diversas modalidades de desestimación. En lo pertinente, el inciso (c) dispone lo siguiente:

> (c) Después que la parte demandante haya terminado la presentación de su prueba, la parte demandada, sin renunciar al derecho de ofrecer prueba en caso de que la moción sea declarada "sin lugar", podrá solicitar la desestimación fundándose en que bajo los hechos hasta ese momento probados y la ley, la parte demandante no tiene derecho a la concesión de remedio alguno. El tribunal podrá entonces determinar los hechos y dictar sentencia contra la parte demandante, o podrá negarse a dictar sentencia hasta que toda la prueba haya sido presentada. A menos que el tribunal lo disponga de otro modo en su orden de desestimación, una desestimación bajo esta Regla 39.2 y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos.

Este inciso regula la figura de la desestimación por insuficiencia de la prueba (*nonsuit*). *VS PR, LLC v. Drift-Wind, Inc.*, 207 DPR 253, 266 (2021). Esta figura permite al tribunal, "luego de que la parte demandante presente la prueba, **a aquilatarla y a formular su apreciación de los hechos, según la credibilidad que le merezca la evidencia**". *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 916 (2011) (énfasis suplido).

En ese contexto, corresponde al foro primario determinar si la prueba presentada por el demandante es suficiente, por sí sola, para satisfacer los elementos de su causa de acción. De concluir que no lo es, el tribunal puede, en el ejercicio de su sana discreción, desestimar la reclamación.

No obstante, nuestro Tribunal Supremo ha sido enfático en que dicha facultad debe ejercerse mediante un escrutinio sereno y cuidadoso, y que cualquier duda razonable debe resolverse a favor de permitir que la parte demandada presente su prueba. Ello obedece a que una desestimación al amparo de la Regla 39.2(c), conlleva la terminación de la reclamación del demandante y, por ende, de su oportunidad de obtener un remedio judicial. *Id.*; véase, además, *Lebrón v. Díaz*, 166 DPR 89, 93-94 (2005).

## D. Prueba pericial

El Capítulo VII de las Reglas de Evidencia regula lo concerniente a las opiniones y al testimonio pericial. En particular, la Regla 702 de Evidencia, 32 LPRA Ap. VI, R. 702, dispone lo siguiente:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita -conforme a la Regla 703- podrá testificar en forma de opiniones o de otra manera.
>
> El valor probatorio del testimonio dependerá, entre otros, de:
>
> (a) si el testimonio está basado en hechos o información suficiente;
>
> (b) si el testimonio es el producto de principios y métodos confiables;
>
> (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
>
> (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
>
> (e) las calificaciones o credenciales de la persona testigo; y
>
> (f) la parcialidad de la persona testigo.
>
> La admisibilidad del testimonio pericial será determinada por el Tribunal de conformidad con los factores enumerados en la Regla 403.

Por su parte, la Regla 703 de Evidencia, 32 LPRA Ap. VI, R. 703, establece los requisitos para la calificación de una persona como perita. En lo pertinente, dispone lo siguiente:

> (A) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para

calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.

(B) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.

(C) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

Al evaluar la prueba pericial, nuestro Tribunal Supremo ha expresado que "los tribunales tienen amplia discreción en la apreciación de la prueba pericial pudiendo, aun, adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta". *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of Puerto Rico, Inc.*, 150 DPR 658, 662-663 (2000). Véase, además, *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 297 (2006).

En ese sentido, la norma es liberal en cuanto a la admisibilidad de la prueba pericial, pues se permite que el conocimiento especializado provenga tanto de educación formal como de experiencia práctica. *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of Puerto Rico, Inc.*, supra, pág. 663.

No obstante, la competencia y las cualificaciones del perito, la solidez de los fundamentos de su opinión, la confiabilidad de la ciencia o técnica subyacente, así como su posible parcialidad, son factores pertinentes al valor probatorio de su testimonio. *Id.*, págs. 663-664. De igual forma, la especialización del perito en área determinada puede resultar decisiva al momento de adjudicar el peso que merece su opinión, aunque no necesariamente afecte su cualificación para testificar como perito. *Id.*, pág. 664.

A esos efectos, el Tribunal Supremo ha señalado que "la ausencia de credenciales suficientes puede afectar el valor probatorio del testimonio pericial. Cuando se trata de casos

minuciosos, como son las controversias de impericia médica, 'la especialidad de un perito en cierta área puede ser decisiva en cuanto al valor probatorio de su testimonio'". *Cruz Flores v. Hospital Ryder Memorial, Inc.*, supra, pág. 495 citando a *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R*, *supra*, pág. 664 (nota al calce omitida).

Expuesto el derecho aplicable, estamos en posición de atender las controversias planteadas en el recurso ante nuestra consideración.

**-III-**

Por estar íntimamente relacionados, discutiremos conjuntamente los tres señalamientos de error.

En esencia, los Apelantes cuestionan que el foro primario haya desestimado el caso mediante un *nonsuit*. Particularmente, fundamentan su planteamiento en que, al momento de ser calificado el doctor Miranda como perito, el foro *a quo* expresó que el valor probatorio de dicho testimonio estaría sujeto, entre otros criterios, el resto de la prueba pericial que se presentara en el caso, lo cual no ocurrió. Asimismo, argumentan que el foro primario emitió una determinación en sala basada en ciertos criterios que luego fueron variados en la sentencia escrita, lo que alegan constituyen un abuso de discreción del juzgador y una privación de su día en corte.

De otro lado, en los méritos, sostienen que, ante la ausencia de otros testimonios periciales que impugnaran el del doctor Miranda, el tribunal sustituyó indebidamente la prueba pericial por su propio "criterio médico". Exponen que el testigo demostró que los Apelados incumplieron con el estándar de cuidado aplicable, toda vez que la fisiatra y la doctora Otero sospecharon que el señor Rosado padecía de osteomielitis, pero no completaron el proceso diagnóstico ni el tratamiento correspondiente a dicha condición.

Asimismo, impugnan la determinación del tribunal de no conferirle credibilidad al perito por el hecho de que este no revisó los

expedientes médicos del Hospital Dr. Susoni sino hasta días antes del juicio. Añaden que el perito aceptó que el médico de dicho hospital pudo haber incurrido en algún tipo de negligencia, pero sostienen que ello no exime la responsabilidad atribuida a los Apelados.

De entrada, este tribunal descarta los primeros dos argumentos, discutidos en los señalamientos primero y tercero. La Regla 702 de Evidencia, *supra*, establece los criterios para la evaluación del valor probatorio de la prueba pericial. Sin embargo, dicha disposición no impone como requisito que el valor probatorio de un perito dependa de la existencia de otros testimonios periciales de la parte contraria. Asimismo, los Apelantes no han citado disposición estatutaria o jurisprudencial que le requiera a los Apelados presentar prueba pericial. En consecuencia, el hecho de que el foro primario hiciera referencia a dicho aspecto al momento de la calificación del perito no impide que, en la etapa procesal correspondiente, se evaluara una solicitud de desestimación por insuficiencia de prueba.

En cuanto al segundo planteamiento, relativo a que el foro *a quo* habría variado los fundamentos expresados en sala al dictar sentencia, concluimos que tal alegación no se sostiene. Una comparación entre lo expresado oralmente al concluir el juicio y la sentencia escrita revela que los fundamentos esenciales son consistentes. En ambos momentos el tribunal determinó que los médicos no se apartaron del estándar de cuidado aplicable, al ordenar los estudios diagnósticos pertinentes para evaluar la condición del paciente, y que no se estableció nexo causal entre las actuaciones imputadas y los daños alegados.

Asimismo, el tribunal sostuvo que la prueba pericial presentada por los Apelantes no fue persuasiva, entre otras razones, por no haber considerado en su totalidad el expediente clínico del

paciente, particularmente los récords del Hospital Dr. Susoni, y por no establecer adecuadamente el estándar de cuidado aplicable. Por tanto, no se configuró la alegada variación sustancial entre lo expresado en sala y lo resuelto en la sentencia.

Examinado el expediente, concluimos que los fundamentos de la sentencia recurrida son consistentes con la determinación anunciada en corte abierta, aunque expuestos con mayor detalle y precisión. El Tribunal Sentenciador cuenta con discreción y poder para así proceder. En consecuencia, no se cometió el error imputado.

En cuanto a los méritos de la desestimación, luego de examinar los escritos de las partes, la transcripción de la prueba oral y la *Sentencia* recurrida, concluimos que el foro primario actuó correctamente al desestimar la causa de acción.

En este caso, la controversia central gira en torno a si los Apelados debieron haber diagnosticado osteomielitis vertebral durante la hospitalización del señor Rosario en el HMMC, y si la alegada falta de diagnóstico oportuno constituyó negligencia médica causal de los daños alegados.

De entrada, los Apelantes cuestionan la determinación del foro primario de no conferir credibilidad al perito, alegando que este no fue impugnado por otros peritos y que el tribunal sustituyó su criterio médico por el propio. Sin embargo, contrario a lo planteado, concluimos que el foro primario no sustituyó prueba pericial por su propio criterio médico. Lo que ocurrió en el presente caso es que el foro primario ejerció su función adjudicativa de evaluar el valor probatorio de la evidencia presentada, conforme a las Reglas de Evidencia y la jurisprudencia aplicable. Reiteradamente, el Tribunal Supremo ha sostenido que ningún tribunal está obligado a aceptar las conclusiones de un perito, aun cuando estas sean técnicamente correctas. *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 918.

En el ámbito de la impericia médica, el demandante tiene la obligación de establecer, mediante prueba pericial, el estándar de cuidado aplicable, la desviación de dicho estándar y el nexo causal entre dicha desviación y los daños sufridos. En este caso, al examinar en su totalidad el testimonio del doctor Miranda y su informe pericial, no surge de manera clara cuál es el estándar de cuidado aplicable ni las exigencias de la profesión médica en la situación particular del paciente.

Durante la hospitalización médica en el HMMC, el doctor Ortiz y la doctora Otero ordenaron varios estudios clínicos. Incluso, el propio perito de los Apelantes reconoció que dichos estudios fueron apropiados, al igual que las consultas que hicieron.[17] No obstante, sostuvo que los médicos fallaron en considerar los resultados de los estudios nucleares como definitivos y no documentaron la realizaron de una correlación clínica ni histórica para validar dichos resultados, a pesar de que los estudios no identificaron la osteomielitis.[18] De esta manera, sostuvieron que ningún facultativo elaboró una teoría científica y de lógico juicio clínico sobre los resultados de ambos estudios (Gallium y el MRI).[19]

A su vez, expuso que "hubiera sido prudente" hablar con el médico nuclear y con el radiólogo para que se pusieran de acuerdo si es que el estudio no tenía la suficiente resolución radiológica para identificarla.[20] Incluso, aseveró que "eso ameritaba, **tal vez**, una consulta con el radiólogo", "**para ver de qué forma**, **qué protocolo** de estudios radiológicos o combinación de estudios radiológicos podría entrar en luz para que él dijera categóricamente, tiene o no

---

[17] Transcripción de la Prueba Oral ("TPO"), tomo I, págs. 45-46; tomo 2, pág. 42, líneas 16-20, y págs. 76-77.

[18] Apéndice de los Apelantes, Anejo 3, pág. 44. Véase, además, TPO, tomo I, pág. 46-47, 63-64 y 71; tomo 2, págs. 93-94, 98-99 y 102.

[19] Apéndice de los Apelantes, Anejo 3, pág. 42. Véase, además, TPO, tomo 1, pág. 72, líneas 1-3, en la que el perito indicó que no hay en el récord una nota validando o ampliando una opinión de juicio clínico sobre el particular.

[20] TPO, tomo I, pág. 47, líneas 9-11.

tiene disquitis".[21] Más aún, durante su testimonio expresó que su posición era que **se debió agotar los recursos disponibles en el hospital y considerar hasta fuera del hospital para llegar a un diagnóstico definitivo**.[22] Asimismo, sostuvo que "uno tiene que ver **si hay otra condición** que pueda producir una clínica diferencial, que son los diagnósticos diferenciales".[23] Finalmente, aseveró que los médicos no debieron conformarse con los estudios, sino realizar otros para comparar.[24]

De esta forma, la opinión del perito se fundamenta esencialmente en la posibilidad de que, mediante un enfoque diagnóstico más amplio o distinto, se hubiera podido llegar a un diagnóstico diferente. Su opinión es meramente especulativa y no satisface el estándar probatorio exigido en nuestro ordenamiento jurídico en materia de impericia médica.

En efecto, la mera posibilidad de que un resultado distinto mediante un tratamiento o enfoque alterno no es suficiente para establecer negligencia médica ni causalidad. Nuestro ordenamiento exige prueba de que la actuación médica no fue razonable conforme al estándar aplicable y que dicha actuación fue la causa probable de los daños alegados.

En este caso, la prueba pericial no estableció adecuadamente cuál era el estándar de cuidado aplicable ni demostró que la conducta de los Apelados se apartó de prácticas aceptadas por la

---

[21] *Id.,* pág. 47, líneas 18-19; pág. 51, líneas 1-3 (énfasis suplido). Véase, además, pág. 57, líneas 11-13. En las líneas 16-21 se indicó lo siguiente:

> Pues aumenta la resolución radiológica y lo que es posible o probable, **a lo mejor** se puede descartar. **Y nunca está de más o menos hablar con el radiólogo** y decirle qué tú necesitas para que tú me confirmes si hay disquitis o no. **Y a lo mejor** él dice, pues vamos a hacer magnificar el estudio con contraste intravenoso, o vamos a hacer unas vistas especiales, o vamos a hacer cualquier otro estudio para hacerlo.

(Énfasis suplido). Véase, además, tomo 2, págs. 105-106.
[22] *Id.*, tomo 1, pág. 55, líneas 18-20; tomo 2, pág. 100.
[23] *Id.*, tomo 1, pág. 56, líneas 7-8.
[24] *Id.*, tomo 2, pág. 109.

comunidad médica.[25] Su testimonio se limitó a explicar que los Apelados debieron seguir buscando un posible diagnóstico.

Asimismo, tampoco demostró que los actos realizados por los Apelados no fueran razonables ni que estuvieran aceptado por amplios sectores de la profesión médica. Máxime cuando la evidencia presentada demostró que las pruebas nucleares necesarias para diagnosticar osteomielitis vertebral fueron realizadas y no demostraron su presencia al momento de la hospitalización en el HMMC. Incluso, el doctor Ortiz diagnosticó dolor secundario debido a cambios degenerativos de la espalda y el perito de los Apelantes confirmó ese diagnóstico. [25] Debemos recordar que el error de juicio honesto e informado cometido por un médico en el tratamiento de su paciente no constituye fuente de responsabilidad.

Además, los Apelantes fallaron en demostrar que los médicos fueron negligentes y que dicha conducta negligente fue el factor **que con mayor probabilidad causó los daños alegados**. En ese sentido, los primeros no puede descansar en la mera posibilidad de que el daño se debió a la falta de diagnóstico de los médicos al momento de la hospitalización. Le correspondía probar que dicho acto fue lo que causó los daños alegados; o sea, que fue la causa eficiente o decisiva que, por sus circunstancias particulares, determinó la ocurrencia del daño.

Sin embargo, en este caso el foro primario determinó correctamente que los médicos realizaron varios estudios radiológicos que descartaban la infección; que al salir del HMMC tenía los glóbulos blancos y los neutrófilos bajos, no tenía fiebre y se fue caminando;[26] que al regresar al acudir al Hospital Dr. Susoni tuvo los glóbulos blancos y los neutrófilos elevados lo que

---

[25] *Id.*, tomo 1, pág. 53, líneas 15-24; pág. 56, líneas 5-8.
[26] *Id.*, tomo 2, págs. 49, 98.

representaba una infección bacteriana aguda, lo que implicaba pocos días (menos de 14 días) antes de su diagnóstico;[27] que los expedientes médicos del Hospital Dr. Susoni no fueron evaluados al momento del informe, pero que el perito expresó que hubo negligencia compartida;[28] que el señor Rosario abandonó el Hospital Dr. Susoni en contra de recomendación médica;[29] y que en el Centro Médico no fue operado de manera oportuna, a pesar de su situación médica crítica.[30] En ese contexto, los Apelantes no lograron probar que las supuestas omisiones de los Apelados fueran las que con mayor probabilidad causaron los daños alegados, en particular, las serias deficiencias neurológicas y la paraplejia.

En fin, dado que los Apelantes no demostraron que el foro primario haya actuado con error manifiesto, pasión, prejuicio o parcialidad, y que, por el contrario, todo lo anterior demuestra que los señalamientos de error no fueron cometidos, concluimos que el foro primario actuó correctamente al desestimar la causa de acción, sin necesidad de que los Apelados presentaran su prueba.

**-IV-**

Por los fundamentos previamente expuestos, se **confirma** la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[27] *Id.*, tomo 2, págs. 60-61, 72.
[28] *Id.*, tomo 1, pág. 41, líneas 10-14; pág. 77.
[29] *Id.*, tomo 2, pág. 60.
[30] *Id.*, págs. 64-65.